IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. BLAKE PERCIVAL | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. 11-CV-527-WKW |
| v. | ) | |
| | ) | |
| U.S. INVESTIGATIONS SERVICES, INC., | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

## UNITED STATES' COMPLAINT
### (False Claims Act; Breach of Contract)

Plaintiff, the United States of America (United States), by its undersigned counsel, represents as follows:

1.    The United States brings this civil action to recover treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA), and to recover damages and other monetary relief for breach of contract.  This action arises from false statements and claims that Defendant U.S. Investigations Services, Inc. (USIS) knowingly presented to, or caused to be presented to, the United States and the United States Office of Personnel Management (OPM) related to background investigations that were not reviewed in accordance with the requirements of the parties' contracts, in violation of the FCA and the common law.

## I. JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over the United States' claims brought under the False Claims Act, 31 U.S.C. §§ 3279, *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.

This Court has supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. §§ 1345 and 1367(a).

3.      This Court has personal jurisdiction over USIS pursuant to 31 U.S.C. § 3732(a) because USIS transacts business and is found in this district.

4.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because USIS transacts business in this District.

## II. PARTIES

5.      Plaintiff is the United States of America, acting on behalf of the United States Office of Personnel Management.

6.      Relator Blake Percival is a United States citizen and resident of Alabama who was employed by USIS from 2001 through June 2011.  From January 2011 until the end of his employment with USIS, Mr. Percival was the Director of Fieldwork Services at USIS.

7.      Defendant USIS is a company organized pursuant to the laws of Delaware with its principal place of business in Falls Church, VA.  USIS employs over 2,500 credentialed field investigators and other employees who work in all fifty states, including Alabama.

## III. BACKGROUND

### A.      The Federal False Claims Act

8.      The False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains plus a penalty if the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."   31 U.S.C. § 3729(a)(1)(A) (2009).  Prior to the FERA amendments, this provision provided that a person is liable to the United States

government if the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government…[a] false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1) (2006).

9.      As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains, plus a penalty, if the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2009).  Prior to the FERA amendments, this provision provided that a person is liable to the United States government if the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2006).

10.      The FCA, as amended, defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded…."  31 U.S.C. § 3729(b)(2)(A) (2009).  As relevant to this civil action, the FERA amendments clarified, but did not substantially change, the definition of "claim."  31 U.S.C. § 3729(b)(2)(A) (2006).

11.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A) (2009).  The FCA further provides that "no proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2009).

12.     The United States alleges that, from at least March 2008 through September 2012, USIS violated the foregoing provisions of the FCA by seeking payment for background investigations purportedly completed in accordance with the requirements of its contracts with OPM, when it knew the contractually required quality review had not occurred on those investigations.  Due to USIS's fraudulent conduct, OPM accepted and paid for background investigations it would not otherwise have accepted or paid for had it known the truth.

**B.      USIS's Contractual Relationship with OPM**

13.     OPM's Federal Investigative Service (FIS) is responsible for performing background investigations of current or prospective federal employees or contractors for a variety of federal agencies.  OPM conducts background investigations for over one hundred federal agencies, including the Department of Justice, Department of Homeland Security, Department of Health and Human Services, Department of Transportation, Department of Treasury, and Department of Defense, Defense Intelligence Agency.

14.     On average, OPM conducts over 2.2 million background investigations per year.

15.     While some of the background investigations are performed by OPM staff, OPM also contracts with various private companies to perform the fieldwork on the investigations for OPM.

16.     USIS is one of several companies that OPM has contracted with over the years to conduct the fieldwork on the background investigations.  USIS has been conducting background investigations for OPM under government contracts since 1996.

17.     During the relevant time period, USIS entered into two separate fieldwork contracts related to background investigations:  (1) Contract Number OPM04-06-00013; and (2) OPM15-110-C-0015 (collectively, the "Fieldwork Contracts").  USIS also entered into a support services contract, Contract No. OPM04-06-00004 (the "Support Contract").

i.     **The 2006 Fieldwork Contract**

18.     The first fieldwork contract at issue here, Contract Number OPM04-06-00013, was executed with an effective date of July 7, 2006.  Under that contract, USIS was responsible for conducting the investigatory fieldwork on applicants seeking new or continued employment with federal agencies or one of their contractors.  Depending upon the type of investigation at issue, the contractually required fieldwork might entail conducting interviews of the applicant and/or friends or family of the applicant, conducting educational or employment records checks, running law checks, and/or running a check of the applicant's credit history.  Background investigators prepare "Reports of Investigations," or "ROIs," documenting the results of their interviews and/or record checks on an applicant.

19.     The contract also required that USIS conduct a quality review on each ROI comprising a background investigation, also referred to as a "case," before submitting the completed case to OPM for processing and payment.  Specifically, Section C.6.1.2 of the contract, titled "Contractor Quality Control – Compliance with Quality Standards," stated as follows:

> The contractor shall conduct a pre-submission quality review of all OPM products and shall maintain an inspection and evaluation system to ensure all investigative work products and other deliverables submitted to OPM conform to the contract requirements

and, where applicable, national investigative and adjudicative standards.  The contractor shall not submit for payment any report that does not meet the requirements of this contract.

20.     Section C.9.4.1 of the contract further stated:  "The Contractor shall conduct a quality review of all investigative reports to ensure that the investigations are conducted in accordance with the guidance in this SOW and as outlined in the OPM Investigator's Draft Handbook Version 5-Dated March 2005 and Handbook Revisions Notices."

21.     USIS understood that it was required to conduct a full quality review on each background investigation prior to submitting the completed investigation to OPM for processing and payment.  In the Technical Proposal that USIS submitted for the contract, USIS stated: "Field Operations Support staffs conduct a quality review of all investigative reports prior to delivery."   USIS further stated in its Technical Proposal:  "USIS' Quality Control Program provides at least one level of quality Inspection for every ROI submitted."

22.     After the fieldwork was completed and the background investigation was supposedly reviewed by a USIS Reviewer, the completed background investigation was sent to OPM for processing.  At that point, OPM would pay USIS the vast majority of the payment due under the contract for the completed background investigation.  The remainder of the payment would be made after the case was processed and closed by OPM.  The amount OPM paid USIS for completed background investigations ranged from $95 to $2,500, depending upon the type of background investigation at issue.

## ii.     The 2011 Fieldwork Contract

23.     In 2011, USIS and OPM entered into a follow-on contract to the 2006 fieldwork contract with an effective date of December 1, 2011.  Like the 2006 contract, USIS was responsible under the 2011 contract for conducting the fieldwork on any background investigations assigned to it by OPM.

24.     The 2011 fieldwork contract similarly required USIS to conduct a pre-submission quality review on each and every ROI comprising a case.  Specifically, Section C7 of the contract, titled "Contractor Quality Control – Compliance with Quality Standards," states:

> The Contractor shall conduct a pre-submission quality review by a qualified reviewer of all OPM-FIS products and shall maintain an inspection and evaluation system to ensure that all investigative work products and other deliverables submitted to OPM conform to contract requirements, national investigative and adjudicative standards. The Contractor shall not submit for payment any case that does not meet the requirements of this contract.

25.     Section F.8 of the contract further provides:  "The Contractor shall deliver completed, reviewed investigative items electronically to OPM . . . ."

26.     The 2011 fieldwork contract remains in effect.

### iii.     The Support Contract

27.     In addition to the Fieldwork Contracts, USIS was also awarded the Support Contract, under which it was responsible for assisting OPM with various administrative tasks related to the background investigations program.

28.     Pursuant to that contract, USIS was responsible for, among other things: scheduling background investigations for OPM; various case/file management functions, including finger print processing, generic record searches, and case control file processing; and imaging files of completed investigations for retention.

29.     Under the Support Contract, USIS was also responsible for conducting a final review of, and closing, background investigations conducted by all OPM contractors, which included background investigations that USIS itself had completed under the Fieldwork Contracts.  Once a contractor completed a background investigation, it was sent to OPM for processing.  At that point, a final review of the entire background investigation would be conducted before the investigation was closed and sent to the agency that requested the

investigation.  OPM itself would review certain types of background investigations.  The rest would be sent to USIS under the Support Contract and USIS would conduct the final review and closing of the case for OPM.

30.     USIS has a designated team called the Closing Authorization and Support Team (CAST) that was responsible for conducting a review of the completed background investigations and then closing those investigations so that they could be sent to the agency that had requested the investigation.  FIS determined the investigations to be closed by FIS federal staff and those to be sent to CAST for review and closing.

### C.     The Work Flow Process

31.     During the relevant time period, the assignment and management of the background investigations process between OPM and its contractors was handled electronically. Specifically, when FIS received a request from an agency to complete a background investigation, the relevant information was entered into OPM's electronic Personnel Information Processing System ("PIPs").  PIPs recorded who would be conducting the investigation (FIS versus a contractor) and the schedule for completion of the fieldwork on the investigation.

32.     If an investigation was assigned to USIS, PIPs electronically forwarded the information related to the investigation to USIS.  Included in the information forwarded to USIS was the due date by which the completed file had to be returned to OPM.  Typically, FIS gave USIS and other contractors sixty to ninety days to complete a background investigation.

33.     After it was assigned a background investigation, a USIS employee referred to as a Workload Leader reviewed the information on the case, and then assigned the case to a particular USIS region (or multiple regions if the applicant lived in more than one geographic area during the relevant time period).  The case was reviewed by a second Workload Leader within the designated region(s) and then assigned to a particular background investigator(s).

34.     The Fieldwork Contracts required that all background investigators perform full and complete investigations on each applicant.  Background investigators were responsible for preparing ROIs documenting the results of their investigatory fieldwork.  If an applicant lived in multiple geographic areas during the time period of the investigation, multiple field investigators would be assigned, and each would prepare its own ROI.  Thus, each applicant's background investigation file could have been comprised of multiple ROIs.

35.     After ROIs were completed, they were transmitted to OPM's mainframe in the District of Columbia.  They were then accessed remotely by a Workload Leader at USIS's facility in Western Pennsylvania, who then assigned the ROIs to USIS Reviewers.  The Fieldwork Contracts required USIS to conduct a quality review on each and every ROI to ensure that it conformed to OPM standards.  USIS understood that the Fieldwork Contracts required that a quality review by a USIS Reviewer be conducted on each ROI before submission to OPM for payment.

36.     The USIS Reviewer reviewed the ROI and, if the Reviewer determined that additional fieldwork needed to be conducted or that the ROI otherwise did not conform to OPM standards, the Reviewer sent the ROI back to the field investigator for additional work.  If the Reviewer determined that no additional fieldwork was needed and that the ROI conformed to OPM standards, then the Reviewer made an electronic "Review Complete" notation in OPM's PIPs system.

37.     After the last ROI on a case had been submitted in PIPs and identified by USIS with a "Review Complete" notation, the completed background investigation was automatically identified in PIPs as "Field Finished," which triggered the automatic release of the case to OPM for processing.

38.    Once a case was transferred through PIPs to OPM as "field finished," it triggered OPMs obligation to pay USIS the initial payment for that case.  OPM then forwarded to USIS the initial payment amount for that case type.  The remainder of the payment amount was sent by OPM to USIS after the case was closed.  Payments under the Fieldwork Contracts were made by electronic transfer through the Treasury Financial Communications System.

39.    In addition to the payments USIS received for each completed background investigation, under the Fieldworks Contracts, USIS was also eligible for and received annual bonus payments for meeting certain OPM goals.  Specifically, each year, OPM evaluated USIS's performance in three areas:  timeliness of completed background investigations, quality of work, and program management.  Depending upon its performance in each of these areas, USIS would be eligible to receive an annual bonus payment.  The decision to award a bonus, and the amount of that bonus, was entirely within the discretion of OPM.

40.    USIS was awarded and received bonus payments for fiscal years 2008 ($2,418,109), 2009 ($3,504,636), and 2010 ($5,826,853), which totaled $11,749,598.  Had OPM been aware of USIS's actions, as detailed below, it would not have awarded USIS the bonuses above because it would not have deemed USIS's performance acceptable in the timeliness and/or program management areas.

41.    After a background investigation was closed by OPM, the completed file was forwarded to the agency that requested the investigation.  The agency was then responsible for reviewing the file and making any necessary determinations regarding the applicant's eligibility for new or continued employment and/or possession of a security clearance.

## IV. <u>The Fraudulent Scheme</u>

A.      <u>USIS's Dumping Practices</u>

42.      Beginning in at least March 2008 and continuing through at least September 2012, USIS management devised and executed a scheme to deliberately circumvent contractually required quality reviews of completed background investigations in order to increase the company's revenues and profits.  Specifically, USIS devised a practice referred to internally as "dumping" or "flushing," which involved releasing cases to OPM and representing them as complete when, in fact, not all ROIs comprising those cases had received a quality review as required by the Fieldwork Contracts.

43.      USIS engaged in the practice of dumping in order to meet budgeted goals and, therefore, increase its revenues and profits.  Given that USIS was paid by OPM for each completed case, the more cases USIS completed each month the more money it received from OPM.  USIS's dumping practices also enabled the company to receive annual performance incentive payments that it would not otherwise have been entitled to receive absent the dumping.

44.      Initially, USIS would dump cases manually.  Soon after the dumping started, however, USIS began using a software program called Blue Zone to assist in the dumping practices.  Through Blue Zone, USIS was able to identify a large number of background investigations, quickly make an electronic "Review Complete" notation indicating that the ROIs at issue had gone through the review process even if they had not, and then automatically release all of those ROIs to OPM with the "Review Complete" notation attached.   By using Blue Zone, USIS was able to substantially increase the number of background investigations that could be dumped in a short time period.

45.      The dumping occurred at USIS's Western Pennsylvania facility.  The dumping was effectuated primarily, but not exclusively, by a specific employee in that facility, a USIS

Workload Leader.  Each morning, the Workload Leader and others would identify all of the ROIs that needed to be reviewed that day in order to meet USIS's internal goals.  The Workload Leader would then assign the ROIs to the various USIS Reviewers in the Western Pennsylvania facility.  USIS Reviewers were instructed to review as many ROIs as possible during the work day.

46.     At the end of the day, the Workload Leader and/or other designated staff would determine how many assigned ROIs had not been reviewed that day.  Using Blue Zone, the Workload Leader and/or other designated staff would then "dump" some or all of the ROIs that the review team had been unable to review.   ROIs ready for review but which had not been assigned to a Reviewer that day might also be dumped.  The Workload Leader and the other individuals who carried out the dumping actions were instructed to engage in dumping by their supervisors and other members of USIS management, as described below.

47.     At first, dumping occurred only at the end of the day.  Eventually, however, the dumping became more frequent.  USIS's internal budgeted number of cases to be reviewed each day increased over time and, as a result, more cases needed to be dumped to meet monthly goals set by USIS management.  As a result, the Workload Leader and the other individuals involved in the dumping began dumping cases at various times throughout the day, and the number of cases that were dumped increased.

48.     The Workload Leader, in coordination with his supervisor, USIS's Quality Control Manager in the Western Pennsylvania facility, would assign a priority system to the various ROIs in an attempt to mitigate the negative effects of the dumping.  These employees would assign priority codes to the various ROIs ranging from 1-6 depending upon the "risk" level associated with the ROI.  For example, a more complicated ROI involving extensive

fieldwork might be assigned a priority code of 1 or 2, whereas a less complicated ROI involving only one interview or simply a record check might be assigned a priority code of 6. When it came time to determine which cases to dump, the Workload Leader or other designated individual(s) would first dump the ROIs with a priority code of 6. If more cases needed to be dumped, they would then move to priority 5 cases and so on.

49.     While dumping occurred on a daily basis, the number of cases dumped tended to increase significantly at the end of the month, quarter, and year. At those times, USIS management, including, but not limited to, USIS's Production Support Manager and USIS's Director of National Quality Assurance, would often direct the Workload Leader and his supervisor, the Quality Control Manager, to clear out the shelves, which they understood to mean that they should release all cases in the queue waiting to be reviewed. This practice was followed in order to meet USIS's internal goals for completed cases and, therefore, to increase the company's revenues and profits.

50.     In addition to the Workload Leader, other USIS employees who at times performed dumping included, but were not limited to, USIS's Director of National Quality Assurance and Quality Control Manager, both of whom both worked in USIS's Western Pennsylvania facility.

**B.      USIS Management Was Aware of and Directed the Dumping**

51.     USIS Senior Management was fully aware of and, in fact, directed the dumping practices. Beginning in at least March 2008, USIS's President/CEO established the internal revenue goals for USIS. USIS's Chief Financial Officer determined how many cases needed to be reviewed or dumped to meet those goals.

52.     The number of cases needed to be reviewed or dumped to meet revenue goals was conveyed to USIS's Vice President of Field Operations and USIS's President of Investigative

Service Division, who in turn communicated this information to other members of USIS management, including USIS's Production Support Senior Manager.  The Production Support Senior Manager and others, in turn, would convey those goals to other USIS employees, namely USIS's Director of National Quality Assurance and the Quality Control Manager in Western Pennsylvania, and would provide instructions to those employees on when and how many cases needed to be reviewed or dumped to meet USIS's goals.  These employees would then instruct the Workload Leader to dump the number of cases necessary to meet USIS's goals.  The instructions from the Director of National Quality Assurance and the Quality Control Manager to dump cases were made verbally via telephone, in some face-to-face meetings, and occasionally over email.

53.     Internal USIS documents confirm that USIS Senior Management was aware of and directed the dumping practices.   For example, in one undated internal document, a USIS employee discussing the dumping practices stated: "They will dump cases when word comes from above, such as from [the President of Investigative Service Division] and [the President/CEO].  In the past, [the President of Investigative Service Division] and [the President/CEO] have told us to clear out our shelves in order to hit revenue.  When this is done they will dump all [priority code] 6.  If [the President of Investigative Service Division] and [the President/CEO] tell them they need to clear out more then they will dump [priority code] 5's….  Last July through September we were dumping all [priority code] 4, 5, and 6's per [the President of Investigative Service Division] and [the President/CEO]."

54.     Another email chain dated September 16 and 17, 2010 involving USIS's Vice President of Field Operations and its President of Investigative Service Division, among others, discussed the need to dump cases to meet revenue goals.   The Vice President of Field

Operations referenced USIS's revenue situation as "[w]e all own this baby, and right now we are holding one ugly baby."  The USIS Workload Leader in Western Pennsylvania forwarded that email to the Director of National Quality Assurance and the Quality Control Manager in Western Pennsylvania and responded:  "The only two things we can do in review to get them out faster is to (a) hire or (b) dump…. I don't know if there's any other levers left to flip other than dumping everything we know is bad.  Just a side note, the more MSPC [Master Scheduling Production Control] rams through, the more the field will transmit sub-standards, and the more [the number of cases needing secondary review] will go up.  Come EOM [End of Month], if they're going to tell us to just dump all those cases anyways without a proper review, which [sic] will only make that ugly baby even uglier…"

55.    Internal USIS emails confirm that USIS management was acutely aware of the dumping of cases.  Every day, the Workload Leader in Western Pennsylvania would send an email to his supervisors with the subject line "EOD [End of Day] Numbers."  The email would detail the number of ROIs released by USIS during that day, and often the emails would contain comments about the number of cases dumped.  For example, an email dated April 30, 2010 from the Workload Leader to the Director of National Quality Assurance and Quality Control Manager states:  "Shelves are as clean as they could get.  Flushed everything like a dead goldfish."   Another email dated May 25, 2010 involving the same group of people reads:  "We dumped all we could to try and hit the 1100 mark but fell short…even dumped the new flagged/flushed [cases pulled from the field] and got ahead on secondary, but just didn't have what we need [to meet USIS's internal goals]."

56.    Other internal emails show that dumping was a frequent and accepted occurrence at USIS.  In an email dated October 29, 2010, the Workload Leader in Western Pennsylvania

sent a message to the Director of National Quality Assurance and the Quality Control Manager, among others, stating, "t'is Flushy McFlushershon at his merry hijinks again!!  **leprechaun dance**…I'm not tired…"    In another example, on December 27, 2010, the Workload Leader also wrote to the Director of National Quality Assurance and the Quality Control Manager: "Scalping tickets for 'Dick Clark's Dumpin' New Year's Eve! …Who needs 2?  Have a bit of a backlog building, but fortunately, most people are off this week so no one will notice!"

### C.     Examples of Dumped Background Investigations

57.     During the time period March 2008 through September 2012, USIS released at least 665,000 background investigations to OPM and represented them as complete when, in fact, one or more of the ROIs comprising those background investigations had not received a quality review as required by the Fieldwork Contracts.  This represented approximately forty percent of the total background investigations conducted by USIS during that time frame.

58.     The background investigations that were dumped spanned most government agencies, including the Department of Justice, Department of Homeland Security, Department of Health and Human Services, Department of Transportation, Department of Treasury, and Department of Defense, Defense Intelligence Agency, and included most types of background investigations.

59.     The background investigations that were dumped included the less complicated investigations such as National Agency Checks with Law Checks (NACLC), which involve a check of the applicant's credit history, legal record and a check of government agency files (e.g., Federal Bureau of Investigation files and fingerprint records).  The dumped investigations also included more complicated investigations such as Single Scope Background Investigations (SSBI), which involve, among other things, the law, credit and agency checks noted above as

16

well as interviews of past and present employers, coworkers, and other individuals associated with the subject of the investigation.

60.     USIS would dump ROIs knowing that there could potentially be quality issues associated with those dumped ROIs.  For example, an email dated October 6, 2010 from a USIS employee to, among others, the Director of National Quality Assurance and the Quality Control Manager regarding a meeting on USIS's Case Deficient Rate, states:  "We can not get a clear quality rating when we dump half our cases."  "Quality rating" refers to the rate at which cases are "kicked back" to USIS for further rework after the second level review conducted by FIS staff.

61.     Examples of cases improperly dumped by USIS include:

- On or around January 07, 2009, USIS received a request from OPM to conduct a background investigation on AA, an employee of the Department of the Interior.  On or around March 5, 2009, USIS released that background investigation to OPM and, by doing so, represented that the background investigation had received the contractually required quality review by USIS. In fact, at least one of the ROIs comprising that background investigation did not receive the quality review required by the contract.  Following receipt of the background investigation from USIS, the background investigation received a federally controlled quality review by OPM and was closed. Believing that the background investigation had been conducted by USIS in accordance with the requirements of the contract, OPM paid USIS $999.21 for that background investigation on or around March 6, 2009.

- On or around January 7, 2010, USIS received a request from OPM to conduct a background investigation on BB, an employee of the Department of Defense.  On or around February 17, 2010, USIS released that background investigation to OPM and, by doing so, represented that the background investigation had received the contractually required quality review by USIS. In fact, at least one of the ROIs comprising that background investigation did not receive the quality review required by the contract.  Following receipt of the background investigation from USIS, the background investigation received a federally controlled quality review by OPM and was closed. Believing that the background investigation had been conducted in accordance

with the requirements of the contract, OPM paid USIS $497.88 for that background investigation on or around February 17, 2010.

- On or around February 22, 2010, USIS received a request from OPM to conduct a background investigation on CC, a contractor for the Department of Defense. On or around March 17, 2010, USIS released that background investigation to OPM and, by doing so, represented that the background investigation had received the contractually required quality review by USIS. In fact, at least one of the ROIs comprising that background investigation did not receive the quality review required by the contract. Following receipt of the background investigation from USIS, the background investigation received a federally controlled quality review by OPM and was closed. Believing that the background investigation had been conducted in accordance with the requirements of the contract, OPM paid USIS $2,028.02 for that background investigation on or around March 17, 2010.

- On or around August 01, 2010, USIS received a request from OPM to conduct a background investigation on DD, an employee of the Department of Homeland Security. On or around August 26, 2010, USIS released that background investigation to OPM and, by doing so, represented that the background investigation had received the contractually required quality review by USIS. In fact, at least one of the ROIs comprising that background investigation did not receive the quality review required by the contract. Following receipt of the background investigation from USIS, the background investigation received a federally controlled quality review by OPM and was closed. Believing that the background investigation had been conducted in accordance with the requirements of the contract, OPM paid USIS $470.72 for that background investigation on or around August 26, 2010.

- On or around December 21, 2010, USIS received a request from OPM to conduct a background investigation on EE, a contractor for the Department of Homeland Security. On or around January 11, 2011, USIS released that background investigation to OPM and, by doing so, represented that the background investigation had received the contractually required quality review by USIS. In fact, at least one of the ROIs comprising that background investigation did not receive the quality review required by the contract. Following receipt of the background investigation from USIS, the background investigation received a federally controlled quality review by OPM and was closed. Believing that the background investigation had been conducted in

accordance with the requirements of the contract, OPM paid USIS $1,067.75 for that background investigation on or around January 11, 2011.

- On or around June 22, 2011 USIS received a request from OPM to conduct a background investigation on FF, an employee of the Department of Defense, Defense Intelligence Agency. On or around August 16, 2011, USIS released that background investigation to OPM and, by doing so, represented that the background investigation had received the contractually required quality review by USIS. In fact, at least one of the ROIs comprising that background investigation did not receive the quality review required by the contract. Following receipt of the background investigation from USIS, the background investigation received a federally controlled quality review by OPM and was closed. Believing that the background investigation had been conducted in accordance with the requirements of the contract, OPM paid USIS $1,754.37 for that background investigation on or around September 12, 2011.

62.    Had OPM been aware that USIS had not conducted a quality review on the background investigations listed above, it would not have accepted those investigations as complete and would not have paid USIS for the investigations.

63.    The examples listed above are just some of the thousands of background investigations improperly dumped by USIS. Due to its fraudulent conduct, USIS received millions of dollars that it otherwise would not have received had OPM been aware that the background investigations had not gone through the quality review process required by the Fieldwork Contracts. In addition, had OPM been aware of USIS's fraudulent conduct, it would not have awarded USIS performance awards for the years 2008, 2009, and 2010, which totaled $11,749,598.

**D.    USIS Concealed its Dumping Practices from OPM**

64.    In order to ensure that it's dumping practices would continue undetected, USIS took a variety of actions to conceal the dumping from OPM.

65.     In April 2011, OPM conducted a data analysis of information submitted by USIS in PIPs for a one week period from February 21, 2011 through February 28, 2011.  OPM's analysis showed that a small group of USIS employees were identified as having released a substantial number of cases when compared with the workload of other Reviewers.  OPM's analysis also showed that a large number of ROIs were identified as "Review Complete" when the metadata revealed that the ROI had never been opened by a USIS Reviewer.  OPM raised these concerns in a letter to USIS dated April 4, 2011.

66.     USIS's response to the April 4, 2011 letter never disclosed that the true reason those employees released large numbers of ROIs was because they were not actually reviewing the ROIs, but instead were dumping them.  Nor did USIS reveal that the true reason the metadata showed the ROIs as never having been opened by USIS was because Blue Zone was automatically identifying them as "Review Complete" and then USIS was releasing them to OPM as complete.  Instead, USIS falsely responded that it conducts quality reviews on all ROIs submitted to OPM and falsely attributed the issues noted by OPM to a variety of software problems and glitches.  This response letter, dated April 19, 2011, was signed by USIS's Vice President of Field Operations, who, as detailed above, was aware of and directed the dumping practices.

67.     USIS also ensured that all dumping practices stopped when OPM was on site conducting audits.  For example, USIS delayed dumping cases in September 2011 because FIS personnel were on site at USIS's facility in Western Pennsylvania conducting an audit/inspection.  As shown in an internal email dated October 3, 2011 from the President of the USIS Investigative Services Division to USIS's President/CEO and Chief Financial Officer,

USIS was concerned about dumping cases while OPM was on site conducting the September

2011 audit:

> Looks like we are going to have quite a bit more to push into FY12 than we anticipated. We currently have the highest dollar amount ever in WPA [Western Pennsylvania facility] pending review and release to the customer….almost $8M.
>
> This is driven by a few things….
>
> 1.      The behavior of not pushing too close to the FY utilizing OT [overtime]
> 2.      The detailing to support services
> 3.      High level of scrutiny with mass case releases.  (OPM is actually auditing the review team today and tomorrow)

68.      An October 4, 2011 email from USIS's Chief Financial Officer in response to the

email above from the Vice President of the Investigative Service Division confirms that USIS

waited to dump/flush the September cases until October, after the audit was concluded:  "At the

risk of sounding obvious, we need a robust review recovery plan for October.  Most of the

September miss should "flush" in October, on top of the October number we have included in

our budget…."

69.      USIS took other actions to conceal its dumping practices from OPM.   For

example, as discussed above, FIS would conduct a review on certain of the background

investigations conducted by USIS and other contractors.  If, during that review, OPM determined

that a case was deficient and failed to meet OPM standards, it was "kicked back" to the

contractor for further work.  USIS was required to keep logs of the number of such cases.  The

logs identified the USIS Reviewer who purportedly reviewed and then released the deficient case

to OPM for processing.  OPM had the ability to audit USIS's logs.

70.      Because of USIS's dumping practices, the Workload Leader in Western

Pennsylvania who primarily performed the dumping had an inordinate number of cases released

under his identification number "kicked back" to him by OPM.  In order to avoid any suspicions

by OPM about the work being conducted by that Workload Leader in the event OPM chose to

audit USIS's logs, USIS management instructed employees in the Western Pennsylvania facility

not to log any deficient cases "kicked back" from OPM that had been released by that person.

This practice was summed up in an email dated April 7, 2010 from a USIS employee to the USIS

Quality Control Manager in Western Pennsylvania, among others:

> Just a reminder that, any roiff [Report of Investigation, Field Finished] logged for [the
> Workload Leader] should not be marked as deficient.  Also, please do not indicate auto
> released.  Instead, include a brief summary of what was deficient.  We do not want the
> customer to see this should we be audited again.  Sorry if I did not relay this previously.
> I have gone in and changed any that were marked deficient since last August.

71.     USIS personnel working on the Fieldwork Contracts also improperly used

information received by USIS pursuant to its responsibilities under the Support Contract in order

to prevent OPM from discovering its dumping scheme.  USIS employees responsible for the

review of background investigations under the Fieldwork Contracts would determine which

categories or types of cases FIS was likely to be targeting for review by the federal staff, as

opposed to those cases more likely to be directed to CAST for review and closing.  The

Workload Leader in Pennsylvania who primarily performed the dumping and other designated

personnel would then avoid dumping those types of cases.  This was done to minimize the risk

that cases would be kicked back to USIS by FIS for further rework, and raise concerns at OPM

about the quality of the review process.  For example, in an email dated June 2, 2010, the

Workload Leader wrote to the Quality Control Manager: "We autod what we could yesterday,

but we didn't 'flush' PPRs because of the CAST changes."

## V. CAUSES OF ACTION

### Count I:  False or Fraudulent Claims
(31 U.S.C. § 3729(a)(1)(A) (2009), formerly 31 U.S.C. § 3729(a)(1)(2006))

72.     Paragraphs 1 through 71 are re-alleged as though fully set forth herein.

73.     USIS knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (2009).

74.     USIS knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval.  31 U.S.C. § 3729(a)(1)(2006).

75.     Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus penalties of not less than $5,500 and up to $11,000 for each violation.

**Count II:  False Statements**
(31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2)(2006))

76.     Paragraphs 1 through 71 are re-alleged as though fully set forth herein.

77.     USIS knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B) (2009).

78.     USIS knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  31 U.S.C. § 3729(a)(2) (2006).

79.     Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus penalties of not less than $5,500 and up to $11,000 for each violation.

**Count III: Breach of Contract**

80.     Paragraphs 1 through 71 are re-alleged as though fully stated herein.

81.     OPM entered into a contract with USIS in July 2006 for the performance of background investigation services of prospective or current federal employees or contractors. OPM entered into a follow-on contract with USIS in December 2011.

82.     USIS materially breached its contracts with OPM by failing to perform quality reviews on all ROIs released to OPM for processing as required under the terms of the contracts.

83.     As a result of USIS's breach of contract, the United States has sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, the United States, demands judgment against Defendant as follows:

Under Counts I and II (False Claims Act), for an amount of the United States' damages, trebled as required by law, plus such civil penalties as are required by law, together with all such further relief as may be just and proper;

Under Count III (Breach of Contract), for the damages sustained by the United States, plus interest and costs, and all such further relief as may be just and proper;

Such other relief as this Court may deem just and proper, together with interest and costs of this action.

**THE UNITED STATES DEMANDS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE.**

Respectfully submitted,


STUART F. DELERY
Assistant Attorney General
Civil Division

GEORGE L. BECK, JR.
United States Attorney
Middle District of Alabama

/s/ James Dubois
JAMES J. DUBOIS
Assistant United States Attorney
GA Bar Number: 231445
P.O. Box 197
Montgomery, AL 36101-0197
Telephone No.:  (334) 223-7280
Facsimile No.:  (334) 223-7418
E-mail:  **James.DuBois2@usdoj.gov**

/s/  Melissa Handrigan
MICHAEL D. GRANSTON
TRACY L. HILMER
MELISSA R. HANDRIGAN
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-3083
Email:  **Melissa.R.Handrigan@usdoj.gov**

Dated:  January 22, 2014